## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

CAVINAUGH L. HUGHES (M-18138),

      Plaintiff,

    v.

SARGENT DURRENT, et al.

      Defendants.

No. 15 C 6432

Judge Jorge L. Alonso

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Cavinaugh L. Hughes, an Illinois state prisoner, has brought this *pro se* civil rights action pursuant to 42 U.S.C. § 1983. Hughes claims that Defendants, correctional officials and health care providers who work at the Stateville Correctional Center, violated his constitutional rights by engaging in excessive force against him and acting with deliberate indifference to his medical needs. More specifically, Hughes contends that Defendants unjustifiably sprayed him with OC pepper spray and then denied him follow-up medical care.

All of the Defendants, both Dr. Saleh Obaisi, a medical professional employed by Wexford Health Sources Inc. (hereafter " Dr. Obaisi"), and the correctional staff (hereafter "the IDOC Defendants"), have filed motions for summary judgment pursuant to Fed. R. Civ. P. 56(a). For the following reasons, the Court grants Dr. Obaisi's motion [68] in its entirety and grants in part and denies in part the IDOC Defendants' motion [95].

### I.    Legal Standard

#### A.    Federal Rule of Civil Procedure 56

Pursuant to Federal Rule of Civil Procedure 56(a), this Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." To establish that a material fact is

undisputed, a party "must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials." Rule 56(c)(1). "The court need consider only the cited materials, but it may consider other materials in the record." Rule 56(c)(3). Courts must "construe all facts and draw all reasonable inferences in favor of the nonmoving party." *Van den Bosch v. Raemisch*, 658 F.3d 778, 785 (7th Cir. 2011), citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Once the party moving for summary judgment demonstrates the absence of a disputed issue of material fact, "the burden shifts to the non-moving party to provide evidence of specific facts creating a genuine dispute." *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012). The non-movant must go beyond the allegations of his complaint and "set forth specific facts showing that there is a genuine issue for trial." *Hannemann v. Southern Door County School Dist.*, 673 F.3d 746, 751 (7th Cir. 2012). A genuine issue of material fact exists only if there is evidence "to permit a jury to return a verdict for" the nonmoving party. *Egonmwan v. Cook County Sheriff's Dept.*, 602 F.3d 845, 849 (7th Cir. 2010); *Carroll*, 698 F.3d at 564 ("[m]ere metaphysical doubt" about material facts is not enough).

## B.     Northern District of Illinois Local Rule 56.1

Local Rule 56.1 "is designed, in part, to aid the district court, 'which does not have the advantage of the parties' familiarity with the record and often cannot afford to spend the time combing the record to locate the relevant information,' in determining whether a trial is necessary." *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011) (citation omitted). Under Local Rule 56.1(a)(3), the moving party must provide "a statement of material facts as to which

the moving party contends there is no genuine issue." *Ammons v. Aramark Unif. Servs., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004) (quoting N.D. Ill. L.R. 56.1(a)); *see also* Fed. R. Civ. P. 56(c). The opposing party must then "file 'a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon.'" *Cracco v. Vitran, Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009) (quoting N.D. Ill. L.R. 56.1(b)(3)(B)). The opposing party may also present a separate statement of additional facts that requires the denial of summary judgment. *See Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635, 643 (7th Cir. 2008) (citing N.D. Ill. L.R. 56.1(b)(3)(C)). A court may consider true any uncontested fact in the movant's Rule 56.1 Statement that is supported by the record and is not addressed by the opposing party. *Raymond v. Ameritech Corp.*, 442 F.3d 600, 608 (7th Cir. 2006); *see also* Fed. R. Civ. P. 56(e)(2); Local Rule 56.1(b)(3)(C).

"District courts are entitled to expect strict compliance with Rule 56.1." *Ciomber*, 527 F.3d at 643 (citations and internal quotation marks omitted). A plaintiff's *pro se* status does not excuse him from complying with these rules. *Greer v. Bd. of Educ. of City of Chicago,* 267 F.3d 723, 727 (7th Cir. 2001); *Cady v. Sheahan,* 467 F.3d 1057, 1061 (7th Cir. 2006) ("even *pro se* litigants must follow rules of civil procedure").

As contemplated by Local Rule 56.1, Dr. Obaisi and the IDOC Defendants each filed a statement of uncontested material facts supporting summary judgment in their favor. (Obaisi. Stmt. of Fact, Doc. 69 ("Obaisi SOF"); IDOC Defs. Stmt. of Fact, Doc. 97 ("IDOC SOF").) All Defendants also filed and served on Hughes a Local Rule 56.2 Notice, which explains in detail the requirements of Local Rule 56.1. (Docs. 72, 98.)

Hughes filed several documents, which consist of multiple sub-parts, in response to Defendants' motions. As is relevant here, Hughes filed responses to both sets of Defendants' statements of uncontested fact. ("Pl's Resp. to Obaisi's Undisputed Material Facts," Doc. 106 at 1-13 ("Pl. Resp. Obaisi SOF"); "Pl.'s Resp. to Defs.' Material Facts [as to IDOC Defendants]", Doc. 103 at 2-14 ("Pl. Resp. IDOC SOF").) Hughes also submitted statements of additional facts. ("Pl. Set of Additional Material Facts for Trial [as to Obaisi]." Doc. 106 at 13-15 ("Pl. Obaisi SOAF"); "Pl. Set of Additional Material Genuine Facts for Trial [as to IDOC Defendants]," Doc. 103 at 14-15 ("Pl. IDOC SOAF").) Additionally, Hughes submitted two declarations, one in support of his claim against Dr. Obaisi (Doc. 108 at 1-3, ("Pl. Dec. (Obaisi)")), and one regarding his claims against the IDOC Defendants (Doc. 103 at 16-18, ("Pl. Dec. (IDOC)")), and approximately 20 pages of exhibits in support of his claim against Dr. Obaisi (Doc. 108 at 5-25) and approximately 25 pages of exhibits in support of his claims against the IDOC Defendants (Doc. 103 at 21-55).

Where Hughes has pointed to evidence contrary to Defendants' statements of fact in his responses to those statements, the Court will consider that evidence. The Court will, in general, incorporate Hughes' factual assertions to the extent they provide additional facts relevant to the Court's analysis, are supported by record evidence, or are such that Hughes' properly could testify as to them at trial. The Court further will rely upon Hughes' references to exhibits where they are relevant to the Court's analysis and may be admissible at trial. But the Court will not dig through the record to identify disputed issues of fact. *See Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007) ("In considering a motion for summary judgment, the district court is not required to scour the record in search of evidence to defeat the motion; the

nonmoving party must identify with reasonable particularity the evidence upon which the party relies.").

Hughes, however, cannot create genuine issues of material fact by relying upon legal arguments, conclusions, or suppositions, which do not constitute "facts." *See Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 382 n.2 (7th Cir. 2008); *see also Almy v. Kickert Sch. Bus Line, Inc*., No. 08-cv-2902, 2013 WL 80367, at *2 (N.D. Ill. Jan. 7, 2013) ("[C]ourts are not required to 'wade through improper denials and legal arguments in search of a genuinely disputed fact'") (quoting *Bordelon v. Chi. Sch. Reform Bd. of Trs*., 233 F.3d 524, 529 (7th Cir. 2000)). Nor may Hughes, without demonstrating some source of contrary evidence or personal knowledge of the events, counter Defendants' uncontested facts within their knowledge. *See* Fed. R. Evid. 602. Hughes cannot, for example, counter Dr. Obaisi's statement that other than via the Offender Injury Report, he was never notified/informed by any person that Hughes had requested an appointment with him, or Dr. Obaisi's statement that he interpreted the Report's notation that Hughes was "standing in the shower" to mean his eyes were being flushed, unless Hughes has an evidentiary foundation for disputing those representations. (Pl. Resp. Obaisi SOF ¶ 40, 37.)

Finally, the Court will not consider Hughes' statements of additional facts because they are not factual assertions but rather consist of a series of open-ended legal questions beginning in "whether," *e.g.*, "Whether Dr. Obaisi had the subjective knowledge which condoned his deliberate indifference to Plaintiff's medical needs"; . . . "Whether Defendant Durrett used excessive force when he used OC spray on Plaintiff while he was handcuffed in good faith or bad faith." (Pl. Obaisi SOAF ¶ 2; Pl. IDOC SOAF ¶ 1.)

With these guidelines established, the Court turns to the facts of this case.

## II.  Factual Background

### A.  Parties

Plaintiff Hughes is an IDOC inmate who was incarcerated at Stateville Correctional Center ("Stateville") in August 2014 and is presently incarcerated at Pontiac Correctional Center ("Pontiac").  (IDOC SOF ¶ 1.)  In August 2014, Hughes was incarcerated in segregation at Stateville and was participating in the "weapons violator/staff assaulter program" as discipline for possessing a shank in IDOC custody.  (*Id.* ¶ 5.)

IDOC Defendants Sergeant Durrett, Officer Dobkowski, and Lieutenant Brown all worked in F-House at Stateville during August 2014.  (*Id.* ¶¶ 2-4.)  Defendant Dr. Obaisi is currently, and was in August 2014, the medical director at Stateville.  (Obaisi SOF ¶ 2.)

### B.  Hughes' Version of Events

On August 5, 2014 at 8:51 a.m., Hughes was in a chow line that had stalled and backed up on the stairs.  (Pl's Dec. (IDOC) ¶ 1.)  Correctional Officer Moldovan ordered Hughes to keep moving; in response, Hughes attempted to explain that the line had backed up and he could not move.  (*Id.*)  Officer Moldovan called Hughes a "striper" (a term for inmates in the "weapons violator program") and became aggressive.  (*Id.*)  Officer Moldovan grabbed Hughes' collar and snatched his I.D. card.  (*Id.* ¶ 2.)  Hughes reached back for his I.D., making contact with Officer Moldovan's hand.  (*Id.*; Pl's Dep. at 15: L 13-16.)  Hughes never closed his fist to strike Officer Moldovan and never touched Moldovan's face.  (Pl's Dec. (IDOC) ¶ 2; Pl's Dep. at 26: L 8-14.)  A "10-10" (officer in distress call) issued, and the responding officers immediately subdued, handcuffed, and then placed Hughes on the ground.  (Pl's Dec. (IDOC) ¶ 3.)  Hughes never

resisted. (*Id.* ¶¶ 3-4.) Hughes agrees that the use of force up to this point was reasonable, as was handcuffing him. (IDOC SOF ¶ 30.)

Several minutes later, Defendant Sgt. Durrett, shouting expletives, approached the second gallery landing where Hughes lay handcuffed on the ground. (Pl's Dec. (IDOC) ¶ 4.) He came from two flights of stairs down, and as he was coming to the top of the stairs at the second gallery, he pulled out his OC pepper spray and sprayed Hughes 3-5 times in rapid succession on the exposed side of his face. (*Id.*; Pl.'s Dep. at 21-22.) Sgt. Durrett gave no directives prior to spraying Hughes. (Pl.'s Dep. at 22: L. 8-14.) None of the officers present attempted to stop Sgt. Durrett from using his OC pepper spray. (Pl's Dec. (IDOC) ¶ 5.) Hughes does not know how long each burst lasted. (IDOC SOF ¶ 28.)

Hughes was then taken to a non-working shower on the first gallery of F-House. (Pl's Dec. (IDOC) ¶ 5.) It is an unofficial practice at Stateville to use this area of showers as a waiting room for prisoners who have just committed a disciplinary infraction. (Pl.'s Dep. at 97-99: L. 8-24, 1-6.) A medical technician, Shanal Barnett, then arrived to examine Hughes and document his complaints. (Pl's Dec. (IDOC) ¶ 6.) Hughes informed CMT Barnett that he coincidentally had a healthcare appointment scheduled with Dr. Obaisi that day for an unrelated issue. (Pl.'s Dec. (Obaisi) ¶ 4.) Barnett's examination lasted about five minutes. (Pl.'s Dep. at 98-99.) Hughes had not rinsed off the chemical residue at this point. (Pl's Dec. (IDOC) ¶ 6.)

CMT Barnett then told the F-House Lieutenant, Defendant Lt. Brown, that Hughes needed to have his eyes flushed out and needed to go to the healthcare unit. (Pl's Dec. (IDOC) ¶ 6; Pl.'s Dep. at 98-99: L. 22-24, 1-9.) Lt. Brown responded, "we'll get him up there". (Pl's Dec. (IDOC) ¶ 6.) Lt. Brown then had Hughes moved to the F-House holding facility, which is

about a one minute walk from the shower area.  (*Id.*; Pl.'s Dep. at 100-101.)  There, Hughes and

Lt. Brown talked for about five minutes, during which time Hughes described the altercation

with Officer Moldovan, asked why he was sprayed when he was already handcuffed, and asked

why it was taking so long to get to the healthcare unit while the OC pepper spray continued to set

in.  (Pl's Dec. (IDOC) ¶ 6; Pl.'s Dep. at 101.)

Lt. Brown left, went into F-House, and returned with another officer.  (Pl's Dec. (IDOC)

¶ 7.)  Hughes was ordered to "cuff up", and Lt. Brown instructed the other officer to escort

Hughes to Internal Affairs.  (*Id.*)  Hughes asked Lt. Brown when he would go to the healthcare

unit, and Lt. Brown again said "we'll get you up there".  (*Id.* ¶ 8.)  Hughes then sat through the

entire internal affairs investigation, which lasted until about 4:00 or 4:30 that day, with OC

pepper spray residue in his eyes, face, and clothing.  (*Id.*)

At about 4:00 or 4:30, Hughes was taken to the healthcare unit and placed in a strip cell

with no working toilet or sink.  (Pl.'s Dec. (Obaisi) ¶ 3.)  Hughes still had OC pepper spray on

his face, skin, hair, and clothing.  (*Id.*)  As soon as Hughes arrived at the healthcare unit, he

repeatedly requested to be seen by any medical staff due his exposure to OC pepper spray.  (*Id.* ¶

4.)  Hughes showed the visible orange stains on his clothing left by the OC to every member of

the medical staff that walked by.  (*Id.* ¶ 5.)  He also told them that he already coincidentally had

an appointment with Dr. Obaisi that day, so he should be seen for that in any event.  (*Id.*)

Hughes was not, however, seen; instead, he remained covered in OC pepper spray

throughout the night of August 5, 2014 through 12:00 p.m. August 6, 2014, when he was

transferred to Pontiac.  (*Id.* ¶ 6.)  There he was examined by a physician and prescribed over-the-

counter Visine.  (*Id.*; Obaisi SOF ¶ 26.)

## C.     IDOC Defendants' Version of Events

At approximately 8:51 a.m. on August 5, 2014, while officers were opening cells for weapons violators/staff assaulters chow, Hughes along with a group of inmates gathered on the bottom of the stairs on the second gallery of F-House.  (IDOC SOF ¶ 8.)  Officer Moldovan gave Hughes three orders to go down the stairs, all of which Hughes disobeyed.  (*Id.* ¶¶ 9–15.)  Moldovan then instructed Hughes to hand him his inmate I.D. and report to his cell, but instead, Hughes responded, "I am not doing anything you tell me." (*Id.* ¶¶ 15-16.)  Moldovan removed Hughes' I.D. Card that was clipped on his jumpsuit. (*Id.* ¶ 17.)  In response, Hughes began yelling at Moldovan and approached him. (*Id.* ¶ 18.)

Moldovan backed away, but Hughes pursued and pushed him up against the wall.  (*Id.* ¶¶ 18–19.)  Hughes became aggressive and started striking Moldovan in the face with a closed fist several times.  (*Id.* ¶ 20.)  Moldovan immediately covered to protect himself as Hughes continued throwing multiple closed fists.  (*Id.* ¶ 21.)  Defendant Officer Dobkowski and another officer, Officer Gutierrez, responded and pulled Hughes off of Moldovan in an attempt to secure him.  (*Id.* ¶ 22.)  But Hughes resisted, despite Gutierrez giving Hughes direct orders to stop and cuff up.  (*Id.* ¶ 23.)

Defendant Sgt. Durrett heard the commotion, responded, and observed Moldovan and Gutierrez attempting to restrain Hughes.  (*Id.* ¶¶ 24–25.)  Durrett radioed the 10-10 (officer distress call) to alert other officers.  (*Id.* ¶ 25.)  While Hughes resisted being secured, Durrett administrated a one-second burst of OC pepper spray to Hughes' facial area.  (*Id.* ¶¶ 26–27.)  The OC pepper spray was sprayed on the responding officers as well as Hughes.  (*Id.* ¶¶ 40–41.)

After Durrett sprayed OC, Dobkowski and two other officers took Hughes to the ground, and two officers cuffed him. (*Id.* ¶¶ 31–32.) In accordance with IDOC policy, Hughes was escorted to the first gallery shower in F-House where he stood underneath the shower to wash off the OC spray. (*Id.* ¶¶ 33–34, 46.) Durrett, Dobkowski, Moldovan, and Gutierrez went to the healthcare unit for OC exposure. (*Id.* ¶¶ 40-41.)

At approximately 9:20 a.m., CMT Barnett visited Hughes in the F-House shower for treatment. (*Id.* ¶¶ 42–43.) Lt. Brown also saw Hughes in the first gallery F-House shower, which was operational at the time. (*Id.* ¶¶ 44-45.) In accordance with IDOC policy, CMT Barnett documented her examination in an "Offender Injury Report" and provided it to the healthcare unit to be reviewed by a physician. (*Id.* ¶ 52.) The report says that Hughes was "standing in the shower in F-House" at the time of the examination. (Obaisi SOF ¶ 34.) The report states that Hughes was sprayed with a chemical agent. (*Id.* ¶ 33.) The report notes that Hughes told CMT Barnett, "this shit burns," but states that Hughes' vital signs were normal and notes no distress. (*Id.*) CMT Barnett's "objective findings" written in the report were that Hughes had a swollen right eye with no further injuries. (*Id.*) Hughes already coincidentally had a healthcare appointment scheduled that day for an unrelated matter, and CMT Barnett wrote in the report that Hughes "will f/u [follow up] with MD @ that time". (*Id.* ¶ 36; IDOC SOF ¶ 50.)

After Barnett treated Hughes in the first gallery F-House shower, Hughes was taken to the holding cell outside F-House. (IDOC SOF ¶ 53.) Lt. Brown did not escort Hughes to this holding cell, nor did he instruct anyone to escort Hughes anywhere after seeing him in the first gallery shower in F-House. (*Id.* ¶ 54.) No one instructed Brown to escort Hughes to the healthcare unit or to wash Hughes' eyes out. (*Id.* ¶ 51.) Brown did not see Hughes after seeing

him in the first gallery shower in F-House. (*Id.* ¶ 55.) Hughes sat in the holding cell for about five minutes, and then he was taken to the internal affairs unit for investigation of the incident. (*Id.* ¶ 56.)

**D.     The Internal Affairs Investigation**

At the Internal Affairs Office, Investigator Clements interviewed Hughes. (IDOC SOF ¶ 57.) During this interview, Hughes stated the CO grabbed the middle of his jumpsuit and snatched his I.D. Card, and then Hughes tried to grab his I.D. back from the CO. (*Id.* ¶ 58.) Hughes further testified, "there was some shoving and the rest is a blur." (*Id.* ¶ 59.) Once the interview concluded, Hughes waited for a transfer to another facility, but due to an issue with the transfer, it did not occur until the next day. (*Id.* ¶ 61.) Until then, Hughes waited in the healthcare unit at Stateville. (*Id.* ¶¶ 61–62.) The next day, on August 6, 2014, at approximately 1:00 p.m., the tactical officers from Pontiac arrived to transfer Hughes. (*Id.* ¶ 63.)

At 2:00 p.m., before leaving for Pontiac, Hughes appeared before the Adjustment Committee for a hearing of a disciplinary ticket, issued by Officer Dobkowski, for the assault of Moldovan. (*Id.* ¶ 64.) Dobkowski cited Hughes for Offense DR. 504.100, Violent Assault of Any Person, for striking Moldovan several times in the face and head with a closed fist. (*Id.* ¶65.) Hughes pleaded not guilty, and claimed an officer grabbed his I.D. card off his collar; he further claimed he did not strike the officer, but admits they had a scuffle. (*Id.* ¶ 67.) The Committee found that Hughes struck Moldovan several times in the face and head with a closed fist, stating that the basis for the decision was both Dobkowski's observation of the assault and medical records that showed Moldovan sustained swelling to the right and left side of his head as well as a cut on the inside of his lip. (*Id.* ¶ 68.) Accordingly, the Committee found Hughes

guilty of violently assaulting Moldovan and revoked one year of his good conduct credit, assigned him to one year of C grade, indeterminate segregation, one year commissary restriction, six months of contact visits restriction, and transferred him to a different facility. (*Id.* ¶ 69.) After the hearing, Hughes was transferred to Pontiac. (*Id.* ¶ 70.)

**E.    Dr. Obaisi**

Dr. Obaisi was not present when Durrett sprayed Hughes with OC pepper spray. (Obaisi SOF ¶ 15.) Dr. Obaisi has no memory of CMT Barnett ever orally discussing with him her examination and assessment of Hughes or the facts surrounding her evaluation of Hughes. (*Id.* ¶¶ 27-28.)

It is Dr. Obaisi's practice to see patients or engage in administrative duties from approximately 9:00 a.m. until between 4:00 and 5:00 p.m. each day. (*Id.* ¶ 29.) Between 4:00 and 5:00 p.m., in addition to other charting duties, Dr. Obaisi reviews Offender Injury Reports, which are provided to him for approval. (*Id.* ¶ 30.) Thus, although he does not remember doing so, it would have been his custom and practice to have reviewed the Offender Injury Report prepared by CMT Barnett between 4:00 and 5:00 p.m. on August 5, 2014. (*Id.* ¶ 31.) Dr. Obaisi in fact signed the report that day. (*Id.*)

Prior to reviewing the report at this time, Dr. Obaisi did not know that Hughes had been exposed to OC pepper spray. (*Id.* ¶ 39.) He also had not seen Hughes in the healthcare unit that day. (*Id.*) On August 5-6, 2014, other than via CMT Barnett's Offender Injury Report, Dr. Obaisi was never informed or notified by any member of the health care unit, correctional officer, IDOC staff, or any other person that Hughes was requesting to be seen by him or any other medical doctor. (*Id.* ¶ 39.)

Dr. Obaisi is trained in the medical management of individuals sprayed with chemical agents such as OC pepper spray. (*Id.* ¶ 46.) The standard medical treatment for a person who has been exposed to OC pepper spray is to rinse the eyes with water. (*Id.* ¶ 48.) This can be performed by a person without medical training. (*Id.*) There is no requirement that an individual exposed to a chemical agent such as OC pepper spray must be evaluated by a medical doctor immediately or otherwise. (*Id.* ¶ 38.)

Dr. Obaisi interpreted CMT Barnett's notation on the Offender Injury Report that Hughes "was standing in the shower" to mean that he had his eyes flushed with water at that time. (*Id.* ¶ 35.) Dr. Obaisi's interpretation of CMT Barnett's plan was that Hughes could present for evaluation, if required, at the coincidentally pre-scheduled appointment that day. (*Id.* ¶ 37.) Having so interpreted the report, Dr. Obaisi applied his medical judgment based upon his education, training, and experience as a medical doctor and past experience with individuals who were exposed in the eyes with OC pepper spray, and decided, consistent with the applicable standard of care, to sign off on the report by checking the box that Hughes could see him on an p.r.n. (as needed) basis if he had any residual complaints. (*Id.* ¶ 41.) Dr. Obaisi never personally talked with Hughes or examined him regarding the August 5, 2014 incident. (*Id.* ¶ 42.)

### III.    Analysis

### A.    Excessive Force (Sgt. Durrett)

Based solely on the allegations in Hughes' complaint, the Court allowed Hughes to proceed on a claim that Durrett's use of OC pepper spray constituted excessive force. Durrett now argues that summary judgment should be granted in his favor because Hughes' excessive

force claim is *Heck*-barred and/or the evidence establishes that he deployed the OC pepper spray in a good faith effort to restore order.  (Doc. 96, IDOC Defs.' Mem., 7-8, 13-14.)

The Court first addresses Durrett's argument that Hughes' excessive force claim is *Heck*-barred.  Under *Heck v. Humphrey*, 512 U.S. 477 (1994), a § 1983 plaintiff may not proceed with a claim, if a favorable ruling "would necessarily imply the invalidity of his conviction or sentence" unless and until "the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." *Heck*, 512 U.S. at 486-87.  "[F]or this purpose the ruling in a prison disciplinary proceeding is a conviction."  *Moore v. Mahone*, 652 F.3d 722, 723 (7th Cir. 2011) (citing *Edwards v. Balisok,* 520 U.S. 641 (1997)); *see Gilbert v. Cook*, 512 F.3d 899, 900 (7th Cir. 2008) ("[*Edwards*] extends this doctrine to the decisions of prison disciplinary tribunals").  To properly apply *Heck* and *Edwards*, a district court must analyze the relationship between the plaintiff's § 1983 claim and the charge on which he was convicted.  *VanGilder v. Baker*, 435 F.3d 689, 691 (7th Cir. 2006).   Here, Durrett argues that Hughes' excessive force claim is *Heck*-barred because it challenges the Disciplinary Committee's finding of guilt on the assault charge.  According to Durrett, Hughes "is effectively challenging the Committee's finding that he struck Moldovan to recover damages in this action".  (Doc. 96, IDOC Defs.' Mem. at 13.)

The Seventh Circuit has held that a plaintiff's conviction for assaulting a correctional officer does not "necessarily imply" that the officer used appropriate force *after* the assault. *Gilbert*, 512 F.3d at 901.  The court held "that *Heck* and *Edwards* do not affect litigation about what happens after the crime is completed.  Public officials who use force reasonably necessary

to subdue an aggressor are not liable on the merits; but *whether* the force was reasonable is a question that may be litigated without transgressing *Heck* or *Edwards.*" *Id.* (emphasis in original). A claim of excessive force subsequent to officer assault may, however, imply the invalidity of a conviction if the plaintiff attempts to testify in a way that contradicts the conviction's factual basis. *Viramontes v. City of Chicago*, 840 F.3d 423, 427–28 (7th Cir. 2016). To balance this tension, the Seventh Circuit has repeatedly explained that the district court should implement *Heck* and *Edwards* not by barring an excessive force claim in its entirety, but should instead limit the claim by instructing the jury that it must take as true the facts proved at the earlier criminal or disciplinary proceeding. *Viramontes,* 840 F.3d at 427–28; *Moore,* 652 F.3d at 722; *see Gilbert,* 512 F.3d at 902 (in presenting excessive force claim at trial, plaintiff did not have to confess to assault in order to comply with *Heck*, but jury should have been instructed that plaintiff struck a guard through a chuckhole, as found by disciplinary committee).

Here, Hughes has testified that he never touched Moldovan's face and never closed his face. This depiction is irreconcilably inconsistent with his conviction by the Disciplinary Committee for assaulting Moldovan, where the Committee found that Hughes struck Moldovan "several times in the face and head with a closed fist". *See, e.g., Moore*, 652 F.3d at 724-25 (explaining that a *Heck*-barred denial of facts related to underlying offense includes plaintiff portraying himself "as a lamb—the victim of a gratuitous, brutal attack," in order to "strengthen [his] claim of excessive force"); *Teague v. Armstead*, 82 F. Supp. 3d 817, 827 (N.D. Ill. 2015) ("The factual basis for the relief [the plaintiff] seeks is, given *Heck*, implausible, for it is that the plaintiff was the victim of an utterly unprovoked assault, and while that conceivably is true, it is barred by *Heck*.").

15

Thus, although the Court will allow Hughes to proceed on his excessive force claim given that, as explained below, disputed issues of fact exist regarding the constitutionality of Durrett's *response* to the assault on Moldovan, Hughes will be barred from presenting to the jury any evidence that contradicts his assault conviction's factual basis. Accordingly, the Court will instruct the jury that Hughes struck Moldovan several times in the face and head with a closed fist during the altercation, that any statements to the contrary by Hughes or any other witness must be ignored, and that what the jurors need to determine is whether Durrett used more force than was reasonably necessary to subdue Hughes after the assault. *See Gilbert,* 512 F.3d at 902. With this limitation in place, Hughes' excessive force claim survives summary judgment because he has otherwise raised disputed issues of fact.

"After incarceration, only the unnecessary and wanton infliction of pain constitutes cruel and unusual punishment forbidden by the Eighth Amendment." *Whitley v. Albers*, 475 U.S. 312, 318-19 (1986) (internal quotation marks and citations omitted); *accord Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2475 (2015). The core inquiry in any excessive force case involving prisoners is whether force was applied in a good faith effort to maintain or restore order, or, rather, maliciously and sadistically to cause harm to the inmate. *Guitron v. Paul*, 675 F.3d 1044, 1045-46 (7th Cir. 2012) (quoting *Hudson v. McMillian*, 503 U.S. 1, 7 (1992)). In many circumstances, especially when faced with aggression or physical threat, valid penological justification may exist for the use of OC pepper spray. *Lewis v. Downey*, 581 F.3d 467, 476–78 (7th Cir. 2009). What must be decided in each case is whether the facts surrounding the spray's deployment demonstrated actual malice or sadistic purpose on the part of the user. *Id.* Factors relevant to the inquiry include whether correctional officers perceived a threat to their safety or to that of other

inmates, whether there was a need for the application of force, whether the force used was commensurate with the need for force, efforts made to temper the severity of force used, and the extent of any injury suffered by the prisoner. *Whitley*, 475 U.S. at 321; *Hudson,* 503 U.S. at 7. Notably, "summary judgment is often inappropriate in excessive force cases because the evidence surrounding the officer's use of force is often susceptible of different interpretations." *Cyrus v. Town of Mukwonago,* 624 F.3d 856, 862 (7th Cir. 2010) (citing *Catlin v. City of Wheaton,* 574 F.3d 361, 367 (7th Cir. 2009)).

Here, the Court cannot hold as a matter of law that Durrett acted in good faith and not maliciously or wantonly. *See Hudson*, 503 U.S. at 5. Hughes testified that following the altercation with Moldovan, the other officers handcuffed and subdued him without any resistance on his part, and that several minutes later, Durrett approached him while he was on the ground and deployed the OC pepper spray. If the Court accepts this version of events as to what *followed* Hughes' assault of Moldovan (while accepting the findings of the Disciplinary Committee regarding the assault itself) and draws all reasonable inferences in Hughes' favor as it must at this stage, he has raised genuine issues of material facts regarding Durrett's state of mind when he deployed the OC spray. *See Lewis,* 581 F.3d at 477-78 (reversing district court's grant of summary judgment on Eighth Amendment claim because there was a genuine issue of material fact about the defendant's state of mind when he deployed taser gun); *Hope v. Pelzer,* 536 U.S. 730, 738 (2002) (reasoning that shackling inmate to hitching post was "obvious" Eighth Amendment violation if, as inmate alleged, his threat to guards' safety had abated after he was subdued, handcuffed, and placed in leg irons); *Mitchell v. Krueger*, 594 F. App'x 874, 877 (7th Cir. 2014) (reversing grant of summary judgment on excessive force claim where guard

slammed prisoner on table after prisoner was restrained and had agreed to comply with orders). Durrett's state of mind on the facts of this case is an appropriate issue for a jury and cannot be resolved at the summary judgment phase.

In support of summary judgment, Durrett simply ignores Hughes' version of events and instead premises the constitutionality of his actions upon his own contrary version of the facts. (Doc. 96, IDOC Defs.' Mem., 7-9.)   In his reply brief, Durrett does acknowledge Hughes' account, but contends that it is incredible, especially the notion that several minutes elapsed between Hughes being taken to the ground and Durrett arriving on the scene.   (Doc. 114, IDOC Defs.' Reply, 2-3.)   These lines of argument are plainly inappropriate at this stage: at summary judgment the Court must credit Hughes' version of events.   *See Anderson,* 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."). The court's job as to "a summary judgment motion is not to weigh evidence, make credibility determinations, resolve factual disputes and swearing contest, or decide which inferences to draw from the facts."   *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014).

Accordingly, the Court denies Durrett's summary judgment on Hughes' excessive force claim.   As explained, however, Plaintiff will be limited in the presentation of his claim at trial in that he will be barred from presenting to the jury any evidence that contradicts his assault conviction's factual basis.

## B.     Failure to Intervene (Officer Dobkowski)

Based on the allegations in the complaint, the Court also allowed Hughes to proceed on a claim against Officer Dobkowski for failure to intervene.   The Seventh Circuit recognizes the "failure to intervene" basis for a constitutional violation under the Eighth Amendment.   *See*

18

*Harper v. Albert,* 400 F.3d 1052, 1064 (7th Cir. 2005) (citing *Fillmore v. Page,* 358 F.3d 496,

506 (7th Cir. 2004); *Crowder v. Lash,* 687 F.2d 996, 1005 (7th Cir. 1982). Under this theory, a

defendant can be held liable for a constitution violation under § 1983 only if the plaintiff can

demonstrate that the defendant "(1) had reason to know that a fellow officer was using excessive

force or committing a constitutional violation, and (2) had a realistic opportunity to intervene to

prevent the act from occurring." *Lewis,* 581 F.3d at 472 (citing *Chavez v. Ill. State Police,* 251

F.3d 612, 652 (7th Cir. 2001)); *Harper,* 400 F.3d at 1064; *see also Miller v. Smith,* 220 F.3d 491,

495 (7th Cir. 2000) (citing *Yang v. Hardin,* 37 F.3d 282, 285 (7th Cir. 1994)). Here, Dobkowski

argues that he is entitled to summary judgment because the evidence demonstrates that he did not

have a realistic opportunity to prevent Durrett's use of pepper spray.

The Court agrees. Hughes' own version of events depicts that Durrett deployed his

pepper spray suddenly and without warning, and that Dobkowski was merely an unsuspecting

bystander. Hughes testified that Durrett sprayed him immediately as soon as Durrett reached the

stair landing where he lay. Hughes depicts Durrett's action as spontaneous: he testified that

Durrett did not first issue any verbal or physical warnings. Notably, not even Dobkowski had

time to evade being sprayed. It is undisputed that the bursts hit Dobkowski, too. On those facts,

no reasonable jury could find that Dobkowski had any forewarning of Durrett's intent to use

pepper spray. Dobkowski thus did not have a realistic opportunity to stop Durrett, where the act

of pepper spraying is completed so quickly. *See, e.g., Lewis,* 581 F.3d at 472 (granting summary

judgment on failure to intervene claim where the use of pepper spray was spontaneous and thus

completed before bystander prison guards could prevent it); *Cintora v. Downey*, No. 08-CV-

2298, 2010 WL 786014, at *4 (C.D. Ill. Mar. 4, 2010) (same); *Peacher v. Travis*, No. 3:11CV80, 2013 WL 1069495, at *3 (N.D. Ind. Mar. 12, 2013) (same).

Summary judgment is therefore granted in favor of Officer Dobkowski on Hughes' claim for failure to intervene.

## C.    Deliberate Indifference to Serious Medical Needs (Dr. Obaisi and Lt. Brown)

Based on the allegations of the complaint, the Court lastly allowed Hughes to proceed on a claim that Dr. Obaisi and Lt. Brown were deliberately indifferent to a serious medical need. "A prison official may be found in violation of an inmate's Eighth Amendment right to be free from cruel and unusual punishment if she acts (or fails to act) with 'deliberate indifference to [the inmate's] serious medical needs.'" *Conley v. Birch*, 796 F.3d 742, 746 (7th Cir. 2015) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)); *see also Petties v. Carter*, 836 F.3d 722, 727 (7th Cir. 2016) (en banc). Deliberate indifference claims contain both an objective and a subjective component: the inmate must have an objectively serious medical condition and the defendant must be subjectively aware of and consciously disregard the inmate's serious medical need. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

Invoking the above standard, Defendants Dr. Obaisi and Lt. Brown both argue that they are entitled to summary judgment because Hugh's exposure to OC pepper spray did not constitute a serious medical need. Alternatively, they argue that, in any case, Hughes has not demonstrated that they were deliberately indifferent. As set forth below, the Court grants Dr. Obaisi's motion for summary judgment, but finds that disputed issues of fact preclude summary judgment in favor of Lt. Brown.

### 1.    Dr. Obaisi

First, as an initial matter, Hughes' claim against Dr. Obaisi must necessarily be a narrow one because it is undisputed that Dr. Obaisi had limited knowledge about Hughes' exposure to the OC pepper spray.  "The standard [for deliberate indifference] is actual knowledge." *Doe v. Galster*, 768 F.3d 611, 617-18 (7th Cir. 2014).  An official must both "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.  *Farmer*, 511 U.S. at 837.  "The requirement of subjective awareness stems from the Eighth Amendment's prohibition of cruel and unusual *punishment; 'an inadvertent* failure to provide medical care cannot be said to constitute "an unnecessary and wanton infliction of pain.""" *Zaya v. Sood*, 836 F.3d 800, 804-05 (7th Cir. 2016) (emphasis in original) (quoting *Estelle*, 429 U.S. at 105).

Based upon the record, there is no evidence that Dr. Obaisi knew that Hughes' eyes were not flushed or he was experiencing any pain as a result.  Dr. Obaisi's evidence establishes that his only knowledge of Hughes' condition came from his review of Barnett's offender report between 4 and 5 p.m. on the day of the incident.  Dr. Obaisi testified that prior to reviewing the report at this time, he did not know that Hughes had been exposed to OC pepper spray.  Dr. Obaisi further testified that, other than via CMT Barnett's Offender Injury Report, he was never informed or notified by any member of the health care unit, correctional officer, IDOC staff, or any other person that Hughes was requesting to be seen by him or any other medical doctor.  He lastly explained that he had not personally seen Hughes in the healthcare unit while he was awaiting transfer.  Hughes, having conducted discovery and developed the record, points to no evidence that disputes this evidence.  At this stage of the case, Hughes must "marshal and

present the court with the evidence []he contends will prove h[is] case." *Porter v. City of Chicago*, 700 F.3d 944, 956 (7th Cir. 2012) (the summary judgment stage is often referred to as the "put up or shut up" moment of the case) (citing *Payne v. Pauley*, 337 F.3d 767, 772–73 (7th Cir. 2003).

Nothing in the offender report would have alerted Dr. Obaisi that Hughes' eyes had not been flushed. Although Barnett noted that Hughes said "this shit burns," she also stated that she observed Hughes "standing in the shower in F-House." Dr. Obaisi testified that he interpreted Barnett's notations to mean that Hughes was having his eyes flushed at that time in the shower in which he stood. This interpretation is eminently reasonable and does not reflect deliberate indifference. *See Adams v. Ingram*, No. 12-cv-162-JPG-SCW, 2015 WL 1256442, *4 (S.D. Ill. Mar. 17, 2015) ("No reasonable jury could find [defendant doctor] was deliberately indifferent to [plaintiff's] serious medical needs," where doctor reviewed nurse's report cataloguing symptoms and incorrectly diagnosing sprain, resulting in delay of over one month before doctor's in-person examination and diagnosis of ruptured tendon); *Holmes v. Overall*, No. 13-cv-290-JPG-PMF, 2016 WL 893380, at *4 (S.D. Ill. Mar. 9, 2016) (rejecting plaintiff's assertion that dentist was deliberately indifferent in failing to "prescribe him more medication when she was unable to see him" for appointment as scheduled, "but there is no evidence she was even aware he continued to be in pain after [] course of antibiotic treatment" prescribed by another provider); *see also generally Galster*, 768 F.3d at 617-18 (although officials "cannot escape liability by putting their heads in the sand, ... where there is no evidence that an[ ] official willfully avoided learning of" a serious condition, deliberate indifference could not be established).

Thus, the question is whether Dr. Obaisi violated the Eighth Amendment by signing off on the offender report – reasonably believing Hughes' eyes had already been flushed – even though Hughes had not presented at his unrelated appointment earlier that day. As explained below, Dr. Obaisi's actions cannot support a deliberate indifference claim.

First, Hughes' condition, as understood by Dr. Obaisi, was not an "objectively serious medical need" that could implicate the Eighth Amendment. "Not 'every ache or pain or medically recognized condition' constitutes a serious medical need." *Gutierrez v. Peters*, 111 F.3d 1364, 1372 (7th Cir. 2008); *see also Cooper v. Casey*, 97 F.3d 914, 916 (7th Cir. 1996) (explaining that "minor aches and pains" do not rise to the level of a serious medical condition"). "A serious medical condition is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention." *Hayes v. Snyder*, 546 F.3d 516, 522-23 (7th Cir. 2008) (quoting *Greeno v. Daley*, 414 F.3d 645, 652 (7th Cir. 2005)). A condition also may be objectively serious if a "failure to treat it could result in further significant injury or the unnecessary and wanton infliction of pain." *Id.*

Numerous courts in this circuit have specifically held that exposure to pepper spray or similar chemical agents does not create lingering effects that are objectively serious medical conditions for the purposes of the Eighth Amendment. *See, e.g., Boyce v. McKnight,* No. 14 C 0418, 2015 WL 8778330, *10-11 (N.D. Ill. Dec. 15, 2015) (collecting cases); *Rivera v. MacAdory*, No. 96 C 4674, 1997 WL 17811, at *3 (N.D. Ill. Jan. 16, 1997) (explaining that "lingering unpleasant effects of the mace" after washing eyes and face do not amount to a "serious medical need"); *Foote v. Houi,* No. 03 C 50001, 2004 WL 2901039 at *2 (N.D. Ill. Dec. 14, 2004) ("While [plaintiff] experienced some obvious discomfort from coming in contact with

pepper spray, he has not identified any serious medical condition that was either caused, or aggravated, by the spray."); *Bonnin v. Eau Claire County,* No. 03-C-0065-C, 2004 WL 67478 at *4 (W.D. Wis. Jan. 13, 2004) ("Exposure to pepper spray is not a serious medical need"); *Trotter v. Kingston*, No. 05-C-1032, 2007 WL 984089, at *6 (E.D. Wis. Mar. 27, 2007) (finding on summary judgment that "the injuries of which [plaintiff] complains in the wake of [being indirectly exposed to pepper spray]-shortness of breath, difficulty in breathing, nausea, and tightness in the chest-are, objectively speaking, relatively minor" and not constitutionally actionable). Courts outside this circuit have routinely concluded the same. *See, e.g., Blond v. City of Schenectady,* No. 10–CV–0598, 2010 WL 4316810, at *5 (N.D. N.Y. Oct. 25, 2010) (residual effects of chemical agent do not constitute serious medical need); *Strassner v. O'Flynn,* No, 04–CV–6021CJS, 2006 WL 839411, at *8 (W.D. N.Y. Mar. 27, 2006) (exposure to temporary discomfort of pepper spray is not serious medical need); *Hixon v. City of Golden Valley*, No. CIVA 06-1548, 2007 WL 1655831, at *8 (D. Minn. June 7, 2007) ("Indeed, breathing problems are to be expected after pepper spray is applied, and generally those problems are only temporary. Accordingly, there does not appear to be any reason for officers using pepper spray to assume that the breathing difficulties caused thereby require immediate medical care."); *Censke v. Unknown Ekdahl,* No. 2:08–CV–283, 2009 WL 1393320 (W.D. Mich. May 18, 2009) (plaintiff's complaints of "burning in his nose, lungs, eyes, and skin after being sprayed with chemical agent" do not constitute a serious medical need for purposes of the Eighth Amendment, warranting dismissal); *Britton v. Lowndes County Sheriff's Dept.,* No. 1:04CV160-P-D, 2005 WL 3115525 at *3 (N.D. Miss. Nov. 21, 2005) ("[P]epper spray is specifically designed to prevent serious or permanent injury."). Dr. Obaisi also testified that the standard

24

care for exposure to OC pepper spray is to flush out the eyes, which can be done by non-medical personnel.

Thus, it is well-settled that the mere fact that Hughes had been exposed to pepper spray did not thereby create a lingering serious medical condition that necessitated care by a physician. Nor did Barnett's report contain any notations that should have indicated to Dr. Obaisi that Hughes' situation was somehow unique and did require follow-up care. Not only did her report give the impression that Hughes' eyes had been flushed, but she also wrote that his vitals were normal, and noted that other than some eye swelling, Hughes had no distress or injuries. She did not recommend nor schedule an appointment for Hughes; instead, she merely noted that he could follow-up at his *coincidental* pre-existing appointment.

In sum, no reasonable jury could conclude that the offender report indicated to Dr. Obaisi that Hughes had an objectively serious medical need that Dr. Obaisi disregarded. "A prison's medical staff that refuses to dispense bromides for the sniffles or minor aches and pains or a tiny scratch or a mild headache or minor fatigue—the sorts of ailments for which many people who are not in prison do not seek medical attention—does not by its refusal violate the Constitution." *Gutierrez,* 111 F.3d at 1372 (internal quotations omitted). "[Inmates] are not entitled to receive 'unqualified access to healthcare.'" *Burton v. Downey*, 805 F.3d 776, 785 (7th Cir. 2015) (quoting *Hudson v. McMillian,* 503 U.S. 1, 9 (1992)).

Moreover, even assuming for the sake of argument that Hughes' condition was a serious medical need, he has presented no evidence from which a reasonable jury could find Dr. Obaisi was subjectively deliberately indifferent. The evidence undisputedly shows that Hughes missed his appointment because it conflicted with the internal affairs investigation, not because Dr.

Obaisi refused to treat him or denied him care. Dr. Obaisi, despite his role as medical director, cannot be held liable because other prison staff prevented Hughes' attendance at a medical appointment by detaining him on a disciplinary matter. *See Perez v. Fenoglio*, 792 F.3d 768, 779 (7th Cir. 2015) ("recogniz[ing]" that deliberate indifference might not be found where "someone [other than defendant] was responsible for the alleged delays"); *Walker v. Benjamin*, 293 F.3d 1030, 1038 (7th Cir. 2002) (emphasizing that plaintiff has presented no evidence that "delay between the initial visit, the diagnosis, and the visit to the specialist were within [defendant's] control"); *see also generally Holmes*, 2016 WL 893380, at *4 ("the doctrine of *respondeat superior* is not applicable to § 1983 actions.") (citing *Sanville v. McCaughtry*, 266 F.3d 724, 740 (7th Cir. 2001)). Nor does the fact that Dr. Obaisi did not inquire into Hughes' absence rise to the level of deliberate indifference, given that deliberate indifference is not synonymous with negligence. *See Cesal*, 851 F.3d at 724; *King v. Kramer*, 680 F.3d 1013, 1018-19 (7th Cir. 2012); *Dobbey v. Carter*, No. 12-cv-9223, 2017 WL 2573210, at *6 (N.D. Ill. June 14, 2017) ("[t]here is no evidence indicating that Dr. Carter should have checked Plaintiff's medical file on February 14, 2012 to ensure that the nursing staff had carried out their duties in scheduling a follow-up appointment for plaintiff or that any failure to do so would rise to the level of deliberate indifference.").

For all these reasons, Dr. Obaisi is entitled to judgment in his favor, and his summary judgment motion (Doc. 68) is granted.

### 2. Lt. Brown

Hughes has, however, created a disputed issue of material fact as to whether Lt. Brown was deliberately indifferent to a serious medical need. Prison officials may exhibit deliberate

indifference to a known condition through inaction, *Gayton v. McCoy*, 593 F.3d 610, 623-24 (7th Cir. 2010), or by delaying necessary treatment and thus aggravating an injury or needlessly prolonging an inmate's pain, *Gomez v. Randle*, 680 F.3d 859, 865-66 (7th Cir. 2012); *Smith v. Knox Cty. Jail*, 666 F.3d 1037, 1040 (7th Cir. 2012). Here, Plaintiff testified that (1) his eyes were not flushed immediately following the altercation because the showers to which he was escorted were not operational, but routinely used as a holding area instead; (2) that Hughes heard Barnett (a medical technician) tell Lt. Brown following her examination that Hughes needed to have his eyes flushed out; and (3) that Hughes and Lt. Brown then talked for five minutes during which time Hughes told Lt. Brown that the OC spray was continuing to set in and asked Lt. Brown why it was taking so long to get to the healthcare unit. Instead of taking Hughes to the healthcare unit or otherwise facilitating him to flush out his eyes, however, Lt. Brown stepped away and when he returned, he instructed a different correctional officer to escort Hughes to the Internal Affairs Unit, where Hughes remained all day without flushing the OC pepper spray out of his eyes. This account, if believed by a jury, demonstrates deliberate indifference in that Lt. Brown knowingly denied Hughes the opportunity to flush his eyes of the OC pepper spray, contrary to the direction of a medical technician, and thereby prolonged his pain. *See Kervin v. Barnes*, 144 F. App'x 551, 552 (7th Cir. 2005) ("detaining an inmate for eight hours after using chemical agents without allowing him to wash his face amounts to the wanton infliction of pain and suffering") (citing *Williams v. Benjamin*, 77 F.3d 756, 764-65 (4th Cir. 1996)); *see also Board v. Farnham*, 394 F.3d 469, 485 (7th Cir. 2005) (guards could be held liable for their deliberate indifference by failing to give inmate his inhaler, even though guards knew the inmate suffered from asthma); *Ralston v. McGovern*, 167 F.3d 1160, 1162 (7th Cir. 1999) (prison

guard's "deliberate refusal" to provide pain medicine prescribed by prison physician put forth an Eighth Amendment claim).

In support of summary judgment, Lt. Brown altogether ignores Plaintiff's version of events and instead premises his various arguments that he was not deliberately indifferent upon his own contrary version. (Doc. 96, IDOC Defs.' Mem., 11-12.) As the Court explained earlier with respect to Sgt. Durrett, argument in this vein is plainly inappropriate at summary judgment where the Court must credit Hughes' version of events. *See Miller,* 761 F.3d at 827.

Lt. Brown also contends that Hughes did not have an objectively serious medical need. In support, he incorporates Dr. Obaisi's argument on this point. But the caselaw that Dr. Obaisi cited, and that is discussed above (*see* Section 1), holds that exposure to OC pepper spray does not create a *lingering* condition that requires medical care. The Seventh Circuit has, to the contrary, found that the need to *initially* flush out a prisoner's eyes after OC spray exposure and the resultant pain of failing to do so, are serious conditions that can implicate the Eighth Amendment. *See Kervin,* 144 F. App'x at 552.

Ultimately, resolution of Hughes' claim against Lt. Brown will boil down to a credibility contest between Hughes and the Defendants. Summary judgment is inappropriate under such circumstances. *See Higginson v. Farley,* 83 F.3d 807, 810–11 (7th Cir.1996) (where record is a "swearing contest," summary judgment is inappropriate). Summary judgment in favor of Lt. Brown is therefore denied.

## IV.    Conclusion

The IDOC Defendants' motion for summary judgment [95] is granted in part and denied in part.  Hughes' claim for failure to intervene against Officer Dobkowski is dismissed with prejudice.  Officer Dobkowski is dismissed and terminated.  The motion is otherwise denied. Hughes may proceed on his claims, consistent with the accompanying opinion, for excessive force against Sgt. Durrett and for deliberate indifference to a serious medical need against Lt. Brown.  Dr. Obaisi's motion for summary judgment [68] is granted in its entirety.  Dr. Obaisi is dismissed and terminated.  The Clerk of Court is directed to correct the spelling of Defendant Durrett's name in the caption.  A status hearing is set for September 28, 2017 at 10:15 a.m. to discuss the next steps in the case.  Defendants' counsel shall arrange for Plaintiff to be present by telephone at the next status hearing.


**SO ORDERED.**

ENTERED: September 11, 2017

**HON. JORGE ALONSO**
**United States District Judge**